RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0184p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

HARLEY BLANTON,

            *Plaintiff*,

DEREK PIERSING, on Behalf of Himself and All Others
Similarly Situated,

            *Plaintiff-Appellant*,

   *v.*

DOMINO'S PIZZA FRANCHISING LLC; DOMINO'S PIZZA
MASTER ISSUER LLC; DOMINO'S PIZZA LLC;
DOMINO'S PIZZA, INC.,

            *Defendants-Appellees*.

> No. 19-2388

---

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:18-cv-13207—Victoria A. Roberts, District Judge.

Argued: June 10, 2020

Decided and Filed: June 17, 2020

Before: GRIFFIN, THAPAR, and READLER, Circuit Judges.

---

## COUNSEL

**ARGUED:** Anne B. Shaver, LIEFF CABRASER HEIMANN & BERNSTEIN, LLP, San Francisco, California, for Appellant. Norman M. Leon, DLA PIPER LLP (US), Chicago, Illinois, for Appellees. **ON BRIEF:** Anne B. Shaver, Dean M. Harvey, Lin Y. Chan, Yaman Salahi, Jeremy J. Pilaar, LIEFF CABRASER HEIMANN & BERNSTEIN, LLP, San Francisco, California, Derek Y. Brandt, Leigh M. Perica, MCCUNE WRIGHT AREVALO, LLP, Edwardsville, Illinois, Sharon S. Almonrode, Emily E. Hughes, Dennis A. Lienhardt, THE MILLER LAW FIRM, P.C., Rochester, Michigan, for Appellant. Norman M. Leon, J. Robert Robertson, John J. Hamill, Michael S. Pullos, Mary M. Shepro, DLA PIPER LLP (US), Chicago,

Illinois, David H. Bamberger, DLA PIPER LLP (US), Washington, D.C., Edward J. Hood, CLARK HILL PLC, Detroit, Michigan, for Appellees.

———————————

**OPINION**

———————————

THAPAR, Circuit Judge.  Derek Piersing and Domino's Pizza disagree about whether he should have to arbitrate his claims against the company.  As in many arbitration cases, the question here is who should resolve their dispute:  an arbitrator or a court.  The district court held that an arbitrator should do so.  We agree and affirm.

I.

Domino's has thousands of pizza restaurants across the country.  Like other large chains, Domino's operates many of these restaurants through a franchise model.  Each franchise is an independently owned and managed business with a separate legal identity.  But Domino's still controls certain aspects of each franchise.  Relevant here, Domino's allegedly required its franchises to agree not to solicit or hire employees from other franchises without the prior consent of their employer.

Piersing began working at a Domino's franchise in Washington state in the fall of 2014.  Four years later, Piersing sought a second job from a different Domino's franchise in the area.  When he was hired by the second franchise, Piersing signed an arbitration agreement, which requires him to arbitrate a wide array of issues related to his employment.  The agreement also specifies that the arbitration will be conducted according to the American Arbitration Association National Rules for the Resolution of Employment Disputes ("AAA Rules").

Around the same time, Piersing learned that he had been fired from the first franchise.  According to Piersing, the store fired him because it thought that its franchise agreement with Domino's required it to do so in order to allow him to work at the second franchise.  Piersing worked at the second franchise for a few months until he left his job because of a medical condition.

Piersing and another plaintiff then filed a class action against Domino's, alleging that the company's franchise agreement violated federal antitrust law as well as state law. Domino's soon moved to compel arbitration under the Federal Arbitration Act. *See* 9 U.S.C. § 1 *et seq.* The plaintiffs opposed the motion, arguing that Domino's couldn't enforce the arbitration agreements because the company hadn't signed the agreements (only their franchises had). But the district court ordered the plaintiffs to go to arbitration anyway, finding that both Piersing and his co-plaintiff had agreed to arbitrate not only the merits of certain claims but also threshold questions about the agreements themselves. This appeal followed.

## II.

To understand this case, you first need a little background about federal arbitration law. The Federal Arbitration Act reflects the basic principles that "arbitration is a matter of contract" and that contracts must be enforced "according to their terms." *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010). As a corollary, the Supreme Court has recognized that "parties may agree to have an arbitrator decide not only the merits of a particular dispute but also 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019) (cleaned up). After all, such an agreement is "simply an additional, antecedent agreement" about *who* should decide these questions. *Rent-A-Center*, 561 U.S. at 69. And when parties have agreed to arbitrate "arbitrability," a court may not disregard their agreement—even if a particular argument for arbitration seems to be "wholly groundless." *Henry Schein*, 139 S. Ct. at 528–31.

That leaves the question of *how* to determine whether the parties have agreed to arbitrate "arbitrability." Usually, courts look to state law to interpret arbitration agreements. *See, e.g.*, *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1414–15 (2019). (Here, all agree that Washington contract law applies.) But for questions of "arbitrability," the Supreme Court has adopted an additional interpretive rule: there must be "clear and unmistakable" evidence that the parties agreed to have an arbitrator decide such issues. *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (cleaned up); *see also Rent-A-Center*, 561 U.S. at 69 n.1 (describing this

"heightened standard"). In effect, this rule reverses the usual presumption in favor of arbitration when it comes to questions of "arbitrability." *See First Options*, 514 U.S. at 944–45.

That brings us to the question in this case. In his arbitration agreement, Piersing agreed that "[t]he American Arbitration Association ('AAA') will administer the arbitration and the arbitration will be conducted in accordance with then-current [AAA Rules]." R. 61-4, Pg. ID 982. And those Rules provide that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." R. 61-6, Pg. ID 989. The question for us is whether that's "clear and unmistakable" evidence that Piersing agreed to arbitrate "arbitrability."[1]

There are good reasons to think it is. To start, the AAA Rules clearly empower an arbitrator to decide questions of "arbitrability"—for instance, questions about the "scope" of the agreement. And it's long been settled that parties can incorporate outside documents into a contract if their agreement says as much. *See, e.g.*, *W. Wash. Corp. of Seventh-Day Adventists v. Ferrellgas, Inc.*, 7 P.3d 861, 865 (Wash. Ct. App. 2000); 11 *Williston on Contracts* § 30:25 (4th ed. 2012). Piersing's agreement says as much: it expressly incorporates the AAA Rules into the agreement and even helpfully includes a link to the AAA's website, from which one can easily access the Rules. On its own terms, that's pretty compelling evidence that Piersing agreed to arbitrate "arbitrability."

What the text suggests the case law confirms. The Supreme Court has itself said that the AAA Rules "provide that arbitrators have the power to resolve arbitrability questions." *Henry Schein*, 139 S. Ct. at 528. And the Court has itself relied on the incorporation of the AAA Rules to determine what the parties agreed to. *See Preston v. Ferrer*, 552 U.S. 346, 361–63 (2008); *C*

---

[1]On that point, we should clarify one question not before us. The underlying dispute in this case is whether Domino's (as a non-signatory) has any right to enforce the arbitration agreement as a whole. And both parties have litigated this case on the view that the first question we must answer is whether Piersing agreed to arbitrate that question of "arbitrability." But there might be another, antecedent question here—namely, whether Domino's has any right to enforce the *specific* provision of the agreement in which Piersing purportedly agreed to arbitrate "arbitrability." *Cf. Rent-A-Center*, 561 U.S. at 69–71 (treating the broader arbitration agreement as separate from the specific agreement to arbitrate "arbitrability" and distinguishing between challenges to the former and challenges to the latter). Because that is a distinct question that is not before us, we express no views on it. *See United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) (reiterating the "principle of party presentation" under which courts "rely on the parties to frame the issues for decision" and decide only the "matters the parties present" (citation omitted)).

*& L Enters., Inc. v. Citizen Band Potawatomi Indian Tribe of Okla.*, 532 U.S. 411, 418–20 (2001). It's true that the Court has yet to put these pieces together so as to resolve the question in this case. *See Henry Schein*, 139 S. Ct. at 531. But there's no reason for our court to wait to finish the puzzle. There's little doubt about the final picture.

Our own circuit's precedent counsels—and perhaps compels—the same outcome. In a recent decision, our court relied on the incorporation of the AAA Rules to find that the parties had "clearly and unmistakably" agreed to arbitrate "arbitrability." *McGee v. Armstrong*, 941 F.3d 859, 866 (6th Cir. 2019) (citation omitted). To be sure, our decision also pointed to another provision in the agreement during the course of its analysis. But that provision simply described the *procedures* by which the parties had to raise questions of "arbitrability" before the arbitrator; it didn't purport to expand the arbitrator's *authority* to decide such questions. *See id.* So it's unclear what (if anything) the provision added to the court's analysis. *See In re: Auto. Parts Antitrust Litig.*, 951 F.3d 377, 382 (6th Cir. 2020) (reading *McGee* as holding that the incorporation of the AAA Rules "shows that the parties 'clearly and unmistakably' agreed that the arbitrator would decide questions of arbitrability" (citation omitted)).

What's more, district courts in our circuit have long found that the incorporation of the AAA Rules provides "clear and unmistakable" evidence that the parties agreed to arbitrate "arbitrability." *See, e.g.*, *Cornett v. Cmco Mortg., LLC*, Civ. No. 12-169-ART, 2012 WL 12925599, at *2 (E.D. Ky. Nov. 9, 2012); *see also Willacy v. Marotta*, 683 F. App'x 468, 477 (6th Cir. 2017) (White, J., concurring). Just another persuasive reason for us to do the same.

Finally, consider that every one of our sister circuits to address the question—eleven out of twelve by our count—has found that the incorporation of the AAA Rules (or similarly worded arbitral rules) provides "clear and unmistakable" evidence that the parties agreed to arbitrate "arbitrability." *See Awuah v. Coverall N. Am., Inc.*, 554 F.3d 7, 11–12 (1st Cir. 2009); *Contec Corp. v. Remote Sol., Co.*, 398 F.3d 205, 208–09 (2d Cir. 2005); *Richardson v. Coverall N. Am., Inc.*, — F. App'x —, 2020 WL 2028523, at *2–3 (3d Cir. 2020); *Simply Wireless, Inc v. T-Mobile US, Inc*, 877 F.3d 522, 527–28 (4th Cir. 2017) (same for the "substantively identical" JAMS Rules), *abrogated on other grounds by Henry Schein*, 139 S. Ct. 524; *Petrofac, Inc. v. DynMcDermott Petrol. Operations Co.*, 687 F.3d 671, 675 (5th Cir. 2012); *Fallo v. High-Tech*

*Inst.*, 559 F.3d 874, 878 (8th Cir. 2009); *Brennan v. Opus Bank*, 796 F.3d 1125, 1130–31 (9th Cir. 2015); *Dish Network L.L.C. v. Ray*, 900 F.3d 1240, 1246 (10th Cir. 2018); *Terminix Int'l Co., LP v. Palmer Ranch Ltd. P'ship*, 432 F.3d 1327, 1332 (11th Cir. 2005); *Qualcomm Inc. v. Nokia Corp.*, 466 F.3d 1366, 1372–73 (Fed. Cir. 2006), *abrogated on other grounds by Henry Schein*, 139 S. Ct. 524; *Chevron Corp. v. Ecuador*, 795 F.3d 200, 207–08 (D.C. Cir. 2015) (same for the United Nations Commission on International Trade Law Rules).  And the one remaining circuit has precedent suggesting that it would join this consensus.  *See Commonwealth Edison Co. v. Gulf Oil Corp.*, 541 F.2d 1263, 1272–73 (7th Cir. 1976) (relying on the incorporation of the AAA Rules to find that the parties had agreed to binding arbitration).  Indeed, it's possible that our circuit has *already* joined too.  *See McGee*, 941 F.3d at 866.  But to the extent that there's any ambiguity in our prior decisions, we officially do so today.

## III.

All that's straightforward enough.  But both parties raise some arguments in response.  Some of these arguments require a bit of explanation.  None change our final decision.

## A.

Domino's argues about the correct choice of law.  The company says that the question here—whether there's "clear and unmistakable" evidence that the parties agreed to arbitrate "arbitrability"—presents a question of state law, not federal law.  It's true that some courts have described the question in this way.  *See, e.g.*, *Dish Network*, 900 F.3d at 1246; *Wells Fargo Advisors, LLC v. Sappington*, 884 F.3d 392, 396–99 (2d Cir. 2018).  But these decisions seem to conflate the questions of contract formation and interpretation (which generally involve state law) with the question whether a particular agreement satisfies the "clear and unmistakable" standard (which seems to be one of federal law).  *See, e.g.*, *Arnold v. Homeaway, Inc.*, 890 F.3d 546, 552 & n.4 (5th Cir. 2018); *Brennan*, 796 F.3d at 1128–30; *see also Dish Network*, 900 F.3d at 1252 n.1 (Tymkovich, C.J., concurring).

To see why, consider the Supreme Court's leading case on the "clear and unmistakable" standard.  *See First Options*, 514 U.S. 938.  That decision explained that courts should generally "apply ordinary state-law principles that govern the formation of contracts" in arbitration cases

but then added a "qualification." *Id.* at 944. The "qualification" was that "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clear and unmistakable' evidence that they did so." *Id.* (cleaned up). The Supreme Court then analyzed *for itself* whether there was "clear and unmistakable" evidence that the parties had agreed to arbitrate "arbitrability." *See id.* at 946. Nothing in this analysis suggests that this new standard should be governed by state law. Nor have later decisions suggested anything different. *See, e.g.*, *Rent-A-Center*, 561 U.S. at 69 n.1 (describing the standard as an "interpretive rule" created by the Supreme Court (citation omitted)).

In any event, Washington courts have also found that the incorporation of the AAA Rules (or similarly worded arbitral rules) provide "clear and unmistakable" evidence that the parties agreed to arbitrate "arbitrability." *See In re Estate of Anches*, No. 78732-2-I, 2019 WL 3417100, at *2 (Wash. Ct. App. July 29, 2019); *Raven Offshore Yacht, Shipping, LLP v. F.T. Holdings, LLC*, 400 P.3d 347, 349–50 (Wash. Ct. App. 2017) (same for similarly worded Maritime Arbitration Association Rules). And Piersing hasn't give us any reason to think that the Washington Supreme Court would ultimately adopt the minority view in this debate. So in the end, the choice of law makes no difference here.

B.

For his part, Piersing offers several arguments why we should be the first circuit court in the country to find that the incorporation of the AAA Rules doesn't provide "clear and unmistakable" evidence that he agreed to arbitrate "arbitrability." None prove persuasive.

*The Arbitration Agreement.* Piersing argues that his arbitration agreement incorporates the AAA Rules only as to claims that fall within the scope of the agreement. In other words, he thinks that a court must first determine whether the agreement covers a particular claim before the arbitrator has any authority to address its jurisdiction. But nothing in the relevant provision limits the incorporation in this way. Instead, it simply provides that "the arbitration will be conducted in accordance with then-current [AAA Rules]." R. 61-4, Pg. ID 982. Other courts have read similar references to "arbitration" or "the arbitration" as generally authorizing an arbitrator to decide questions of "arbitrability." *See, e.g.*, *Dish Network*, 900 F.3d at 1244–46;

*Simply Wireless*, 877 F.3d at 525, 527–28; *Awuah*, 554 F.3d at 9, 11; *Terminix Int'l Co.*, 432 F.3d at 1332. And on its own terms, Piersing's reading of the agreement doesn't make much sense. He reads the agreement to say that the arbitrator shall have the power to determine the scope of the agreement *only* as to claims that fall within the scope of the agreement. Yet that reading would render the AAA's jurisdictional rule superfluous.

It's true that some courts have read similar provisions more narrowly when an arbitration agreement carves out certain claims from the very provision that incorporates the AAA Rules. *See, e.g.*, *Archer & White Sales, Inc. v. Henry Schein, Inc.*, 935 F.3d 274, 280–82 (5th Cir. 2019), *cert. granted* — S. Ct. —, 2020 WL 3146679 (June 15, 2020) (No. 19-963). Imagine that Piersing's arbitration agreement said that "the arbitration *(except as to antitrust claims against non-signatories)* will be conducted in accordance with then-current [AAA Rules]." In that scenario, one might think that the agreement "incorporates the AAA rules—and therefore delegates arbitrability—for all disputes *except* those under the carve-out." *Id.* at 281. But to the extent that Piersing's arbitration agreement carves out certain claims from arbitration, it does so from the agreement in general, not from the provision that incorporates the AAA Rules. So the carveout goes to the *scope of the agreement*—a question that the agreement otherwise delegates to the arbitrator—not the *scope of the arbitrator's authority* to decide questions of "arbitrability." *See id.* (describing the "placement of the carve-out" as "dispositive"); *see also Oracle Am., Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069, 1076 (9th Cir. 2013) (warning parties not to "conflate[] the *scope* of the arbitration clause . . . with the question of *who* decides arbitrability"); *Ally Align Health, Inc. v. Signature Advantage, LLC*, 574 S.W.3d 753, 757–58 (Ky. 2019) (same). And that's probably why Piersing doesn't raise any argument about the carveout in his agreement.

*The AAA Rules.* Piersing next offers two reasons why, in his view, the AAA Rules don't require him to arbitrate the question of "arbitrability" at issue in this case. Neither has merit.

Piersing first argues that the relevant AAA rule addresses only the "existence, scope or validity" of his arbitration agreement, not whether a non-signatory may enforce the agreement under state contract law. *See Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630–31 (2009) (explaining that state contract law sometimes allows non-signatories to enforce arbitration agreements under the Federal Arbitration Act). But Piersing overlooks key language in the rule.

In full, the rule provides that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, *including* any objections with respect to the existence, scope or validity of the arbitration agreement." R. 61-6, Pg. ID 989 (emphasis added). The term "including" shows that the latter issues—"existence, scope or validity"—are meant to illustrate rather than exhaust the concept of "jurisdiction." *See, e.g.*, *Burgess v. United States*, 553 U.S. 124, 131 n.3 (2008). So the real issue is whether the question here goes to the arbitrator's "jurisdiction."

Piersing doesn't dispute that the question here goes to the arbitrator's jurisdiction. In fact, he himself says that whether Domino's can enforce the arbitration agreement against him under state contract law involves a "question of arbitrability." Piersing Br. at 9. Hence the AAA Rules cover the question. *See, e.g.*, *Eckert/Wordell Architects, Inc. v. FJM Props. of Willmar, LLC*, 756 F.3d 1098, 1100 (8th Cir. 2014); *Anderton v. Practice-Monroeville, P.C.*, 164 So. 3d 1094, 1101–02 (Ala. 2014); *cf. Brittania-U Nigeria, Ltd. v. Chevron USA, Inc.*, 866 F.3d 709, 715 (5th Cir. 2017) (holding the same for similarly worded arbitral rules); *Apollo Comput., Inc. v. Berg*, 886 F.2d 469, 473 (1st Cir. 1989) (same).

This court has treated the non-signatory question differently when the non-signatory *opposes* arbitration. Imagine, for instance, that Piersing had never signed the arbitration agreement. In that context, our court has said, the question goes to the very "existence of [a valid arbitration] agreement" and thus the court must itself resolve the question even if the agreement incorporates the AAA Rules. *In re: Auto. Parts Antitrust Litig.*, 951 F.3d at 385; *see also DK Joint Venture 1 v. Weyand*, 649 F.3d 310, 317 (5th Cir. 2011) (same); *cf.* 7 Bruner & O'Connor on Construction Law § 21:93 (noting that "arbitrators and judges often draw distinctions between what might be called 'consenting non-signatories' (which seek to arbitrate) and 'non-consenting non-signatories' (which resist arbitration)" (cleaned up)). But Piersing doesn't challenge the "existence" of the arbitration agreement here. Probably because he signed it.

Piersing also argues that even if the relevant AAA rule gives arbitrators the power to decide questions of "arbitrability," it doesn't give them the *exclusive* power to do so. Piersing is right that the rule doesn't include the word "exclusive." But in law the expression of one thing often implies the exclusion of other things. *See, e.g.*, *Bruesewitz v. Wyeth LLC*, 562 U.S. 223,

232–33 (2011). And the same insight holds true in life. Imagine that during dinner one of your children asks whether she can use the car that evening, and you reply, "Sure, you can have the car tonight." Your other children will understand that this child is the *only* person who should use the car that evening even if you don't expressly say as much.

Arbitration agreements may be less fun than a night out with friends. But the same rules of English apply. Most people who read the sentence, "[t]he arbitrator shall have the power to rule on his or her own jurisdiction," wouldn't then think "but a court may also rule on this issue." And things would get pretty chaotic if the rule were read this way. It would lead to a race to the courthouse (or arbitrator's forum) to have each party's preferred decisionmaker be the first to rule on the issue. For if a court ruled on the issue first, then that ruling could bind the arbitrator under the doctrine of res judicata. *See, e.g.*, *Aircraft Braking Sys. Corp. v. Local 856, Int'l Union, United Auto. Workers*, 97 F.3d 155, 159 (6th Cir. 1996). But if the arbitrator ruled on the issue first, then that ruling would be subject to an exceedingly narrow form of judicial review. *See, e.g.*, *Nationwide Mut. Ins. Co. v. Home Ins. Co.*, 429 F.3d 640, 643 (6th Cir. 2005); *see also First Options*, 514 U.S. at 942 (explaining that a court will set aside an arbitration decision involving an issue on which the parties agreed to arbitrate "only in very unusual circumstances"). All this would suggest that the AAA Rules are best read to give arbitrators the exclusive authority to decide questions of "arbitrability."

Still, there may be a kernel of truth to Piersing's argument. The relevant AAA rule looks like what's known in the world of international arbitration as a "competence-competence" clause. *See generally* Restatement (Third) of the U.S. Law of Int'l Commercial and Inv'r-State Arbitration § 2.8 (2019). And there's reason to think that these clauses—when first added to the rules of arbitral institutions almost a century ago—were not meant to give arbitrators the exclusive authority to decide their jurisdiction. They simply confirmed that arbitrators *could* address their jurisdiction. *See* Richard W. Hulbert, *Institutional Rules and Arbitral Jurisdiction: When Party Intent Is Not "Clear and Unmistakable,"* 17 Am. Rev. Int'l Arb. 545, 551–63 (2006).

Yet the problem for Piersing is that the AAA seems to have adopted its jurisdictional rule for a different reason: namely, to provide "clear and unmistakable" evidence that the parties

agreed to arbitrate "arbitrability."  That's at least how the AAA and other sources described the rule at the time of its adoption.  *See, e.g.*, Alan Scott Rau, *Arbitrating "Arbitrability,"* 7 World Arb. & Mediation Rev. 487, 542–43 (2013) (collecting evidence); *AAA Revises Commercial Arbitration Rules*, 53 Disp. Resol. J. 4, 96 (1998) (describing the new rule as a response to the Supreme Court's decision in *First Options*).  *But see* Hulbert, *supra*, at 563 (reading the evidence differently).   And that understanding would seem to undercut any comparison between the AAA's jurisdictional rule and traditional "competence-competence" clauses.

Whatever you think of all this history, in the end we need not rely on it to resolve this case.  The real issue here isn't how an arbitrator would have understood the jurisdictional rule in 1918, but how the parties would have understood it in 2018 (when Piersing signed his agreement).  *See Rent-A-Center*, 561 U.S. at 69 n.1 (describing the "clear and unmistakable" standard as about "the parties' *manifestation of intent*").  At that time, almost every circuit court in the country—including Piersing's local regional circuit—had held that this rule or similar ones gave arbitrators the exclusive authority to arbitrate "arbitrability."  *See, e.g.*, *Brennan*, 796 F.3d at 1130–31.  Washington law pointed to the same conclusion.  *See Raven Offshore Yacht*, 400 P.3d at 349–50.  As did the plain text of the rule itself.  It's often said that parties bargain in the shadow of the law.  To adopt a different understanding of the rule now would deprive countless parties of the benefit of their bargain.

*Circuit Precedent.*   Piersing next claims that our circuit has already held that the incorporation of the AAA Rules doesn't provide "clear and unmistakable" evidence that the parties agreed to arbitrate "arbitrability."   But the cases he cites address two distinct sets of issues.

One line of cases addresses whether the incorporation of arbitral rules from the National Association of Securities Dealers provides "clear and unmistakable" evidence that the parties agreed to arbitrate a specific question of "arbitrability."  *See, e.g.*, *Smith Barney, Inc. v. Sarver*, 108 F.3d 92, 96–97 (6th Cir. 1997), *abrogated on other grounds by Vaden v. Discover Bank*, 556 U.S. 49 (2009).  But nothing in those rules—at least those discussed in the opinion—spoke to the arbitrator's power to address "jurisdiction."   And nothing in our decision said that the incorporation of arbitral rules can *never* amount to "clear and unmistakable" evidence.  Instead,

our decision turned on the specific arbitral rules and the specific question of "arbitrability." *See Smith Barney*, 108 F.3d at 96–97. As it turns out, the question in that case did not even involve one of "arbitrability." *See Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83–86 (2002).

What's more, two of our sister circuits have concluded that the arbitral rules at issue in that case did not provide "clear and unmistakable" evidence, while the arbitral rules at issue in this case do. *Compare Cogswell v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 78 F.3d 474, 480–81 (10th Cir. 1996), *and Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cohen*, 62 F.3d 381, 384 (11th Cir. 1995), *with Dish Network*, 900 F.3d at 1246, *and Terminix Int'l Co.*, 432 F.3d at 1332. Piersing hasn't given us any reason not to draw the same distinction.

The second line of cases addresses whether the incorporation of the AAA Rules provides "clear and unmistakable" evidence that the parties agreed to arbitrate whether to allow classwide arbitration. *See, e.g.*, *AlixPartners, LLP v. Brewington*, 836 F.3d 543, 553 (6th Cir. 2016); *Huffman v. Hilltop Cos., LLC*, 747 F.3d 391, 393–94, 398–99 (6th Cir. 2014); *Reed Elsevier, Inc. ex rel. LexisNexis Div. v. Crockett*, 734 F.3d 594, 599–600 (6th Cir. 2013). But again, these cases turned on the reasoning that nothing in the AAA Rules expressly empowers arbitrators to decide this issue. *See, e.g.*, *Reed Elsevier*, 734 F.3d at 600. And again, two of our sister circuits have distinguished between the question in those cases and the question in this case based on the different structure of the rules and the unique concerns raised by classwide arbitration. *See Richardson*, 2020 WL 2028523, at *2 n.2; *Catamaran Corp. v. Towncrest Pharmacy*, 864 F.3d 966, 973 & n.4 (8th Cir. 2017); *see also JPay, Inc. v. Kobel*, 904 F.3d 923, 945–47 (11th Cir. 2018) (Graham, J., concurring in part and dissenting in part).

It's true that a few circuits have reasoned that all questions of "arbitrability"—whether related to bilateral or classwide arbitration—should be treated the same way. *See JPay*, 904 F.3d at 942–44; *Dish Network*, 900 F.3d at 1247–48; *Wells Fargo Advisors*, 884 F.3d at 398–99. But they did so in holding that the incorporation of the AAA Rules provides "clear and unmistakable" evidence as to *all* questions of "arbitrability." That hardly provides us a basis to hold that the Rules provide such evidence as to *none* of them. Whatever side has the better of this debate, all circuits agree that the incorporation of the AAA provides "clear and unmistakable" evidence here.

*"Clear and Unmistakable."* Piersing also insists that, even if the incorporation of the AAA Rules provides evidence that the parties agreed to arbitrate "arbitrability," it's not "clear and unmistakable" evidence. But his assertion to this effect runs into a solid wall of contrary authority. *See, e.g.*, *Awuah*, 554 F.3d at 11 (describing the AAA Rule as "about as 'clear and unmistakable' as language can get"). Indeed, at the time Piersing signed his arbitration agreement, he not only had the benefit of the text of the agreement but also judicial precedent from both his regional circuit and a local state court telling him that the incorporation of arbitral rules can provide "clear and unmistakable" evidence that the parties agreed to arbitrate "arbitrability." *See Brennan*, 796 F.3d at 1130–31; *Raven Offshore Yacht*, 400 P.3d at 349–50. And even if we don't expect Piersing to read judicial decisions, he certified in his arbitration agreement that he had time to obtain advice from an attorney (who we do expect to read such decisions). *Cf. First Options*, 514 U.S. at 946 (referring to local circuit precedent in evaluating whether the parties had "clearly" agreed to arbitrate "arbitrability"). Given all this, Piersing had ample notice about the meaning and effect of the AAA Rules.

Piersing says that we should distinguish his case because he's not a sophisticated party. But nothing in the Federal Arbitration Act purports to distinguish between "sophisticated" and "unsophisticated" parties. *Cf. AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 346 n.5 (2011). And as judges, we have no authority to redline Congress's work. That's probably why other circuit courts have declined to adopt Piersing's proposed distinction. *See, e.g.*, *Richardson*, 2020 WL 2028523, at *3; *Arnold*, 890 F.3d at 552 & n.5 (collecting cases). We see no reason to be the first.

*Policy.* Piersing finally invokes a policy concern: that a ruling for Domino's would mean that *anyone* could force him to arbitrate "arbitrability" no matter how frivolous the argument for arbitration. But just last year, the Supreme Court rejected a nearly identical argument about "frivolous motions to compel arbitration." *Henry Schein*, 139 S. Ct. at 531. The Court explained that—whatever the merits of this policy concern—it couldn't "rewrite" the text of the Federal Arbitration Act "simply to accommodate [this] concern." *Id.* And it also noted that the concern was "overstate[d]" because arbitrators can quickly resolve frivolous motions and in some cases even impose sanctions for such motions. *Id.*

Keep in mind that the question here is quite narrow.  It's not about the *merits* of the case.  It's not even about *whether* the parties have to arbitrate the merits.  Instead, it's about *who should decide* whether the parties have to arbitrate the merits.  And as the Supreme Court has often said, parties don't give up any of their substantive rights when they choose to arbitrate an issue; they simply select a different forum to resolve their dispute.  *See, e.g.*, *Preston*, 552 U.S. at 359.  That's all that happened here.

## C.

Aside from the merits, Piersing raises two other arguments.  Neither persuades.

*Leave to Amend.*  Piersing argues that the district court erred when it refused him leave to amend his complaint.  Yet the record makes clear that the court never ruled on this issue.  Why?  Because Piersing never filed a *motion* for leave to amend—as contemplated by the Federal Rules of Civil Procedure as well as the local rules.  *See D.E.&J. Ltd. P'ship v. Conaway*, 133 F. App'x 994, 1001 (6th Cir. 2005) (citing E.D. Mich. L.R. 15.1); *PR Diamonds, Inc. v. Chandler*, 91 F. App'x 418, 444 (6th Cir. 2004) (citing Fed. R. Civ. P. 7(b)).  Instead, Piersing simply included a three-sentence request to "narrow" his claims at the end of his brief in opposition to the motion to compel arbitration.  In doing so, Piersing didn't cite any legal authority for his request or list it in his brief's statement of issues.  The district court's failure to address such a cursory request hardly amounts to an abuse of discretion.  *See, e.g.*, *Crosby v. Twitter, Inc.*, 921 F.3d 617, 627–28 (6th Cir. 2019); *Pulte Homes, Inc. v. Laborers' Int'l Union of N. Am.*, 648 F.3d 295, 305 (6th Cir. 2011).

*Vacatur of the Opinion.*  Piersing also asks us to vacate the portions of the district court's opinion that purport to decide whether Domino's can enforce the arbitration agreement under state contract law (specifically, equitable estoppel).  He rightly points out that this question should be decided by an arbitrator, not a court.  But even so, his request misunderstands our role: "[o]ur job is 'to correct wrong judgments, not to revise opinions.'"  *Flight Options, LLC v. Int'l Bhd. of Teamsters, Local 1108*, 873 F.3d 540, 546 (6th Cir. 2017) (quoting *Herb v. Pitcairn*, 324 U.S. 117, 126 (1945)); *see also ASARCO, Inc. v. Sec'y of Labor*, 206 F.3d 720, 722 (6th Cir. 2000) ("Appellate courts review judgments, not statements in an opinion.").  We understand the

district court's "judgment" in this case to be its order to proceed to arbitration—nothing more. *See* 28 U.S.C. § 2106 (noting an appellate court's power to "modify . . . any judgment, decree, or order of a court lawfully brought before it for review"). And whatever else the court's opinion says, *our* opinion makes clear that the arbitrator should decide for itself whether Domino's can enforce the arbitration agreement. We'll leave matters at that.

We affirm.